## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **WILLIAM COHEN, SUE PAIVANAS and CHRISTY OGRODOSKI, individually and on behalf of all others similarly situated,** | |
| **Plaintiffs,** | **JURY TRIAL DEMANDED** |
| **vs.** | Case No. |
| **CAPITAL ONE FUNDING, LLC; CAPITAL ONE MASTER TRUST; CAPITAL ONE MULTI-ASSET EXECUTION TRUST; THE BANK OF NEW YORK MELLON CORPORATION, as Trustee of Capital One Master Trust; and DEUTSCHE BANK TRUST COMPANY DELAWARE, as Trustee of Capital One Multi-Asset Execution Trust;** | |
| **Defendants.** | |

## CLASS ACTION COMPLAINT

1.      Plaintiffs William Cohen, Sue Paivanas, and Christy Ogrodoski, ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this consumer class action against Defendants Capital One Funding, LLC; Capital One Master Trust; and Capital One Multi-Asset Execution Trust, (together, "Defendants") to obtain statutory damages, compensatory damages, punitive damages, restitution, and declaratory and/or injunctive relief for themselves and the Class defined herein.  Defendant The Bank of New York Mellon Corporation is named in its capacity as trustee for Capital One Master Trust and Defendant Deutsche Bank Trust Company Delaware is named in its capacity as Owner-Trustee for Defendant Capital One Multi-Asset Execution Trust.

1

2.      Defendants charge, collect, and receive usurious rates of interest from New York consumers, including Plaintiffs, in excess of New York's usury cap.  In so doing, Defendants have violated New York General Obligations Law § 5-501 and New York Banking Law § 14-a and have been unjustly enriched as a result of their unlawful conduct.  Plaintiffs make the following allegations upon information and belief, except as to his own respective actions, the investigation of their counsel, and the facts that are a matter of public record.

## INTRODUCTION

3.      New York has forbidden the practice of usury for over 200 years.

4.      Since at least 1787, New York has prohibited lenders from charging excessive interest to debtors.[1]  This ancient and bedrock principle remains a part of New York consumer financial law.

5.      At all times relevant to this Complaint, New York has forbidden the collection of interest above 16% per annum.  N.Y. Gen. Oblig. Law § 5-501; N.Y. Banking Law § 14-a.  Persons and corporations are forbidden from "directly or indirectly, charg[ing], tak[ing] or receiv[ing]" interest above the usury limit.  Interest includes not just items labeled as "interest," but also certain fees.  *See* 3 N.Y.C.R.R. § 4.2(b).

6.      The State of New York has such a strong interest in protecting consumers from unreasonable interest charges that receiving interest at some levels is a felony.  New York Penal Law § 190.40 states that a "person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period."

---

[1] *See* L 1787, Ch. 13 (barring taking of interest above 7%).

2

7.      Here, Defendants receive principal and interest payments from Plaintiffs and Class members (as defined below) that are made pursuant to credit card loans.  Defendants have charged, taken, and received interest from Plaintiffs and Class members at rates in excess of 16%, in violation of New York's longstanding civil usury limit.

8.      This class action suit seeks monetary damages, restitution, and injunctive relief to restore wrongfully obtained usurious interest payments and to prevent Defendants from charging, collecting, or receiving usurious interest in the future.

## PARTIES

9.      Plaintiff William Cohen ("Plaintiff Cohen" or "Cohen") is a consumer and a citizen of the State of New York, residing in Brooklyn, New York.

10.      Plaintiff Cohen is a debtor on an unsecured credit card loan.  His credit card loan is branded as the "CapitalOne Platinum MasterCard" ("Cohen Platinum MasterCard Loan").

11.      Mr. Cohen is currently carrying a balance on the Cohen Platinum MasterCard Loan on which he pays an interest rate of at least 25.15%.

12.      Plaintiff Cohen's payments on these loans go to an entity described only as "Capital One" with a mailing address in Carol Stream, IL.

13.      On information and belief, Plaintiff Cohen's payments are owned by, and are paid to, Defendant Capital One Funding, LLC and/or Defendant Capital One Master Trust.

14.      Plaintiff Sue Paivanas ("Plaintiff Paivanas" or "Paivanas") is a consumer and citizen of the State of New York, residing in Jamestown, NY.

15.      Plaintiff Paivanas is a debtor on an unsecured credit card loan. Her credit card loan is branded as the "CapitalOne Platinum MasterCard" ("Paivanas Platinum MasterCard Loan").

16.      Ms. Paivanas is currently carrying a balance on the Paivanas Platinum MasterCard Loan on which she pays an interest rate of 22.5%.

3

17.     Plaintiff Paivanas' payments on these loans go to an entity described only as "Capital One" with a mailing address in Carol Stream, IL.

18.     On information and belief, Plaintiff Paivanas' payments are owned by, and are paid to, Defendant Capital One Funding, LLC and/or Defendant Capital One Master Trust.

19.     Plaintiff Christy Ogrodoski ("Plaintiff Ogrodoski" or "Ogrodoski") is a consumer and a citizen of the State of New York, residing in Auburn, NY.

20.     Plaintiff Ogrodoski is a debtor on multiple unsecured credit card loans.  First, she is the debtor on a credit card loan branded as "CapitalOne Journey" ("Journey Loan").  Second, she is the debtor on a credit card loan branded as "CapitalOne Venture" ("Venture Loan").  Third, she is the debtor on a credit card loan branded as "CapitalOne Quicksilver: ("Quicksilver Loan").

21.     Ms. Ogrodoski is currently carrying a balance on each of these loans. On the Journey Loan, Ms. Ogrodoski pays an interest rate of at least 26.24%.  On the Venture Loan, Ms. Ogrodoski pays an interest rate of at least 24.24%. On the Quicksilver Loan, Ms. Ogrodoski pays an interest rate of at least 27.74%.

22.     Plaintiff Ogrodoski's payments on these loans go to an entity described only as "Capital One" with a mailing address in Carol Stream, IL.

23.     On information and belief, Plaintiff Ogrodoski's payments are owned by, and are paid to, Defendant Capital One Funding, LLC and/or Defendant Capital One Master Trust.

24.     Defendant Capital One Funding, LLC ("Funding") is a Virginia Limited Liability Company.

25.     Defendant Capital One Master Trust ("COMT") is a common law trust for which Defendant The Bank of New York Mellon Corporation is the Trustee.[2]  Defendant Capital One Multi-Asset Execution Trust ("COMET"), is a Delaware Statutory Trust, of which Defendant Deutsche Bank Trust Company Delaware is the Owner Trustee and Defendant Capital One Funding LLC is the beneficiary.[3]

26.     Neither Funding, COMT, nor COMET is a bank.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and more than two-thirds of the putative class reside in states other than the states in which Defendants are citizens.  This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  Declaratory relief is available under 28 U.S.C. §§ 2201 and 2202.

28.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, because Plaintiff Cohen resides in this District and suffered injury as a result of Defendants' acts in this District, many of the acts and transactions giving rise to this action occurred in this District, Defendants do substantial business throughout this District, Defendants have intentionally availed themselves of the laws and markets of this District, and Defendants are subject to personal jurisdiction in this District.

---

[2] In 2007, the Bank of New York merged with Mellon Financial Corporation in to become The Bank of New York Mellon Corporation.
[3] *See* Second Amended and Restated Trust Agreement, January 13, 2006, *available at* http://media.corporate-ir.net/media_files/irol/70/70667/abs/COMET/COMET_AmendedRestatedTrust.pdf
 (Last visited: June 11, 2019).

## FACTUAL BACKGROUND

29.     Defendants have violated New York law by charging and receiving payments from Plaintiffs and other New York consumers at interest rates exceeding the state usury limit.

30.     Defendants acquire the usurious interest payments from Plaintiffs and the Class through a series of purchases involving a shell company as part of a process known as credit card securitization.

### Credit Card Securitization Generally

31.     Credit card securitization transactions begin with a financial institution (the securitization "sponsor") assembling a pool of receivables on credit card loans that it made or acquired.  The sponsor then sells the receivables as part of a multi-step transaction that ultimately results in the sponsor exchanging the receivables for cash.

32.     While the precise details vary among transactions, credit card securitizations generally follow a pattern similar to the following.  First, the sponsor selects specific credit card accounts and sells the entire balance of the receivables arising from those accounts, as well as the right to purchase future receivables generated by those accounts to a wholly-owned, special-purpose subsidiary of the sponsor (the "depositor"), that has no other assets or liabilities.

33.     This first sale is made to isolate the receivables from the sponsor's assets and liabilities, making them "bankruptcy remote," in the sense that they cannot be clawed back into the sponsor's bankruptcy or FDIC receivership estate.  Absent bankruptcy remoteness, investors in the securitization could not invest based solely on the quality of the receivables and the risks specific to them.  Instead, they would be exposed to the overall risks of the sponsor firm.

34.     Second, the depositor sells these receivables (and the right to purchase future receivables) to a passive single-purpose entity ("SPE"), usually a trust.  The SPE must be a stand-alone, legally-independent entity and *cannot be a subsidiary of the sponsor*, in order to ensure that

it could not be consolidated in bankruptcy or FDIC receivership with the sponsor. The legal separation of the SPE from the sponsor and depositor is critical to ensure that investors in the securitization are able to invest solely in the quality of the receivables and the risks specific to them, rather than the overall risks of the sponsor and depositor.

35.     To raise the funds to pay the depositor for the initial receivables, the SPE issues certificated securities (essentially bonds) to the depositor. The depositor sells them to investors through underwriting affiliates. Because these securities issued by the SPE are collateralized by the receivables (assets) owned by the SPE, they are called "asset-backed securities" or "ABS." The depositor then uses the funds from the SPE's sale of ABS to investors in order to pay the sponsor for the initial receivables.[4]

36.     The securitization transaction includes not just the sale of outstanding receivables on the designated credit card accounts, but also the right to purchase any new receivables generated by the designated accounts. As cardholders' subsequent purchase activities generate more receivables on the account, the new receivables are purchased (ultimately) by the SPE from the sponsor through the depositor. The SPE uses the principal payments collected from cardholders on the initial receivables to acquire the new receivables from the sponsor. The interest payments and fees collected from the cardholders are used to pay the SPE's operating expenses and the interest payments due on the ABS.

37.     The SPE is designed to be a passive entity in order to enable ABS investors to invest solely in the risks of the receivables, not the general operating risks of a firm. The credit card receivables the SPE owns must be managed, however, as it is necessary for cardholders to be sent

---

[4] Alternatively, the depositor may transfer the ABS to the sponsor, which will then sell them into the market through an underwriting affiliate or directly. Either way, the ultimate effect is the same: the sponsor has transformed a pool of credit card receivables into cash.

billing statements and for payments to be collected from them.  Therefore, the SPE contracts with a servicing agent (the "servicer") to collect the payments from the cardholders on behalf of the SPE for the benefit of the ABS holders.  The servicer is often the issuer or an affiliate thereof, but need not be. Because the SPE owns the receivables, collections of the receivables from cardholders by the servicer are not made for the benefit of the financial institution that issued the credit cards in the first instance even if the servicer is the issuer.

38.     The securitization transaction effectively separates the beneficial ownership of the receivables from the legal title to the receivables and from the management of the receivables:  the SPE holds the legal title to the receivables;[5] the passive ABS investors (holders of the ABS) are the beneficial owners of the receivables; and the servicer manages the receivables as the agent of the SPE.

### *Defendants' Credit Card Securitization Process*

39.     Defendants Funding, COMT and COMET are engaged in collecting, taking and receiving payments from Plaintiffs and class members for debts incurred through credit card loans, generally originated by non-parties affiliated with Capital One Financial Corporation.

40.     The diagram below, from a February 20, 2019 prospectus for notes issued by Defendant COMET, outlines the way credit card loan payments are obtained by Defendants.  As shown in the diagram, non-party Capital One Bank (USA) National Association is the sponsor; Defendant Capital One Funding is the depositor, and Defendants COMT and COMET are SPE's that together issue ABS.[6]

---

[5] If the SPE is a common law trust, as is the case here, then the trustee holds legal title to the receivables.
[6] https://www.sec.gov/Archives/edgar/data/922869/000119312519048060/d705467d424b5.htm (last visited: June 2, 2019).



41.     The securitization process begins with consumers opening credit card loan accounts.  In the case of accounts securitized by Defendants, most accounts are originated and marketed by affiliates or agents of non-party Capital One Financial Corporation.

42.     After Plaintiffs and class members open credit card accounts, certain accounts are designated for securitization.

43.     Funding is solely a shell company that has no employees and engages in no activity other than the purchase and re-sale of debts.  Its only function is to purchase receivables and in turn, sell those receivables to COMT.  For purposes of these transactions, the term "receivables" refers to all payments owed by credit card debtors such as Plaintiffs, including principal and interest payments, and payments for all fees, including late fees, over limit fees, and annual fees.

44.     According to Defendants, the purchase of these receivables is a true and complete sale of the loan payments.  As stated in a contract that governs Funding's role in securitization, the Receivables Purchase Agreement, Funding acquired all "right, title and interest, whether now owned or hereafter acquired, in, to and under [the credit card receivables]."[7]  Receivables Purchase Agreement at Sections 2.01(a) and 2.01(d).

45.     Funding and non-party Capital One Bank (USA) National Association further agreed that the loan payments "constitute an absolute sale, conveying good title, free and clear of any liens, claims, encumbrances or rights of others, from Capital One [Bank (USA) National Association] to Funding."[8]  Receivables Purchase Agreement at Section 2.01(d).

---

[7] August 1, 2002 Receivables Purchase Agreement available at http://media.corporate-ir.net/media_files/irol/70/70667/abs/comt/comt_capitalonebank_receivables.pdf (last visited: June 2, 2019) ("Receivables Purchase Agreement").
[8] *Id.*

46.     Under the terms of the contract with non-party Capital One Bank (USA) National Association, Funding is legally bound to purchase and receive the consumers' payments on the designated accounts, even if the debt or fee payment obligation has not yet been incurred. Receivables Purchase Agreement at Section 2.01(a).

47.     COMT is a common law trust with The Bank of New York Mellon Corporation as its Trustee, and exists solely to purchase receivables from Funding, and to facilitate the issuance of asset backed securities collateralized by the payments from class members and other debtors.

48.     COMT purchases the right to the credit card payments of Plaintiffs, class members, and other cardholders from Funding.  Defendants view this transaction as a true and complete sale.

49.     The Amended and Restated Pooling and Servicing Agreement that governs Defendants' securitization activities stated that Funding "hereby transfers, assigns, sets over and other wise conveys to [The Bank of New York Mellon Corporation] Trustee all of its right, title and interest, whether now owned or hereafter acquired, in, to and under" the credit card receivables.[9]  Pooling and Servicing Agreement at Section 2.01.

50.     The Pooling and Servicing Agreement further contained the statement that Defendant The Bank of New York Mellon Corporation, as Trustee, "acknowledges its acceptance of all right, title and interest" to the credit card receivables.  Pooling and Servicing Agreement at Section 2.02(a).

---

[9] Amended and Restated Pooling and Servicing Agreement, dated September 20, 1993 and amended January 13, 2006 available at http://media.corporate-ir.net/media_files/irol/70/70667/abs/comt/COMTAmendedandRestatedPoolingandServicingAgreement.pdf (last visited: June 2, 2019) ("Pooling and Servicing Agreement").

51.     To be particularly explicit, Defendants further stated in the Pooling and Servicing Agreement that the transfer of credit card receivables "constitute a sale, and not a secured borrowing, for accounting purposes."  Pooling and Servicing Agreement at Section 2.01.

52.     Because Defendants' purchase of the debt payment obligations are true sales of all "right title and interest" in the receivables, in the event that the originating entity, in this case likely non-party Capital One Bank (USA) National Association, were placed in FDIC receivership, the payment obligations would not be the property of the receivership estate.

53.     COMET is a Delaware Statutory Trust, with Funding as beneficiary, and Defendant Deutsche Bank Trust Company Delaware as Owner Trustee.  By the terms of its Trust Agreement, COMET is to operate as a "Single Purpose Entity," with its sole purpose to engage in the purchase receivables and to issue debt against the payments from Class members and other debtors.   Trust Agreement at Section 2.03.

54.     To compensate Funding for the receivables, Defendant COMT issued a collateral certificate to Funding, which then conveyed it to COMET.  As described in a recent filing with the Securities and Exchange Commission, the "collateral certificate issued by the Capital One Master Trust represents an undivided interest in the assets of the Capital One Master Trust."[10]

55.     As described in the flow chart above, the collateral certificate conveys the payments of Plaintiffs, class members and other card holders from COMT to COMET.

56.     Having an "undivided interest" in the receivables on Plaintiffs' and the Class members' loans, Defendant COMET sells securities to investors backed by these payment

---

[10] https://www.sec.gov/Archives/edgar/data/922869/000119312519048060/d705467d424b5.htm
(Last visited: June 11, 2019)

obligations as ABS. [11]  The proceeds of these ABS sales, pay for the purchase of receivables from Funding.

57.     As with COMT, COMET is an entity that is "bankruptcy remote," ensuring that the title to class members' loan payments are not subject to recovery in the event that the originating entity were subject to bankruptcy or receivership proceedings.   Moreover, COMET's Trust Agreement contains "nonpetition covenants," in which Defendants Deutsche Bank Trust Company Delaware and Capital One Funding agreed not to "acquiesce, petition, or otherwise invoke" bankruptcy or insolvency proceedings.  Trust Agreement at Section 12.09.

58.     Because COMT and COMET are special purpose entities with no employees, and the credit card receivables must be managed (*e.g.*, billing statements sent out to cardholders and payments collected from them), COMT contracts with a servicer to collect the payments from the cardholders on behalf COMT and COMET for the benefit of ABS holders.

59.     Defendants pay the servicer a fee to collect on the payment obligations owned by the trusts.  As part of this fee, all expenses related to servicing the receivables are reimbursed to the servicer and borne by the trusts.  *See* Pooling and Servicing Agreement at Section 3.02.

60.     Under the Receivables Purchase Agreement, non-party Capital One Bank (USA) National Association granted Defendant Funding a "license to use the name 'Capital One' and all related identifying trade or service marks, signs, symbols, logos, designs … and other intangibles in connection with the servicing of the Receivables purchased hereunder."  Receivables Purchase Agreement at Section 3.03.

---

[11] The sale is done indirectly and the mechanics of the sale are not material to this complaint.

61.     Because Defendants utilize the name, logos, and other indicia of Capital One Bank in billing and collections, the true owner of an account holder's receivables is concealed from the public, including Plaintiffs and the Class.

### *Securitization of Plaintiffs' Debt Payments*

62.     The list of specific accounts whose receivables have been sold is held by Defendants in secret and is ascertainable only from Defendants' nonpublic records.  The Pooling and Servicing Agreement specifically directs the Trustee not to disclose the account numbers or other information indicating which accounts' payments are payable to Defendants.  Pooling and Servicing Agreement at Section 2.02(b).

63.     Public information demonstrates, however, that accounts whose payment obligations have been purchased by Defendants include those of class members paying interest at rates that exceed New York's usury limit.

64.     According to a February 2019 prospectus for ABS from Defendant COMET, consumer credit card receivables owned by COMT have the following attributes: [12]

- 7.02% of the accounts in the securitization pool were from borrowers with a New York billing address (786,642 accounts);

- the average age of the accounts was approximately 168 months;

- the accounts had an average principal receivable balance of $2,818 and an average credit limit of $11,972

- 36.23% of the outstanding receivables had a balance between $1,500.01 and $5,000; and

- 29.86% of the outstanding receivables had a balance between $5,000.01 and $10,000.

---

[12] Prospectus available at
https://www.sec.gov/Archives/edgar/data/922869/000119312519048060/d705467d424b5.htm
(Last visited: June 11, 2019).

65.     Plaintiffs' loans are consistent with these averages and are, upon information and belief, among the loans whose payments have been purchased by Defendant Capital One Funding and Defendant COMT.

66.     Through this securitization scheme, Defendants have engaged in a standard practice and policy of charging, collecting, receiving, and attempting to collect interest from Plaintiffs and class members in excess of the permissible interest rate in New York.

### *Madden* and the *Attempted "Madden Fix"*

67.     In 2015, the Second Circuit considered a usury case brought by a cardholder against a debt collector that had acquired the cardholder's defaulted credit card loan. *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015).  The plaintiff in *Madden*, a New York resident, alleged that the defendants violated the New York usury statute by charging and attempting to collect interest at a rate higher than that permitted by New York law.  The defendant debt collector argued that the National Bank Act ("NBA") preempted the claim alleging violation of the New York state usury rate because the debt collector purchased the plaintiff's credit card loan from a national bank that was entitled to charge an interest rate allowed by the laws of the state, territory, or district where the bank is located.[13]  *See Madden*, 786 F.3d at 250 (quoting 12 U.S.C. § 85).

68.     The Second Circuit rejected the defendant's argument in *Madden* and held that entities other than national banks are only entitled to NBA-preemption under the limited circumstance where application of state law to the underlying action would significantly interfere with a national bank's ability to exercise its powers under the NBA. Specifically, the Second Circuit noted that "state usury laws would not prevent consumer debt sales by national banks to

---

[13] More specifically, the defendants argued that "as assignees of a national bank, they too are allowed under the [National Bank Act] to charge interest at the rate permitted by the state where the assignor national bank is located—here, Delaware." *Id.* at 250.

third parties. Although it is possible that usury laws might decrease the amount a national bank could charge for its consumer debt in certain states (i.e., those with firm usury limits, like New York), such an effect would not 'significantly interfere' with the exercise of a national bank power." *Id.* at 251.  The Supreme Court denied *certiorari*.

69. The Second Circuit's decision in *Madden* thus made clear that non-banks cannot charge usurious interest rates merely because they purchased or were assigned loans by national banks.

70. Following the *Madden* decision, the banking industry was indisputably on notice that national banks could not sell or assign their ability to charge otherwise usurious interest rates to non-national bank third parties.

71. In fact, the industry conceded this fact when urging the Supreme Court to grant *certiorari*.  The Structured Finance Industry Group, an entity that lobbies on behalf of entities engaged in securitization, admitted in its *amicus* brief in favor of *certiorari* that *Madden* held that the National Bank Act does not "preempt the application of state usury law to sales of bank loans to non-banks[.]" Brief of the Structured Finance Industry Group, Inc., et al. as Amici Curiae in Support of Petitioners, *Midland Funding, LLC v. Madden*, No. 15-610 (December 10, 2015) at 3.

72. Industry *amici* urged that *Madden* be overturned, explicitly because "firms have removed loans made to borrowers in the Second Circuit from asset-backed securitizations due to usury concerns." Brief of the Clearing House Association, LLC, et al. as Amici Curiae Supporting Petitioners, *Midland Funding, LLC v. Madden*, No. 15-610 (December 10, 2015) at 23. Notwithstanding this industry understanding of the law, non-banks, including Defendants here, still collect and receive interest from New York consumers in violation of New York's usury limit.

16

73.     Indeed, although Funding, COMT or COMET are not banks, they continued to purchase usurious credit card receivables from a national bank well after the *Madden* decision.

74.     Rather than bring securitization practices into compliance with the clear statement of law, the lending industry chose to lobby Congress unsuccessfully to change the law.

75.     The lending industry reported spending millions of dollars collectively on lobbying activity in 2017 and 2018, with specific references to two congressional bills informally known as "*Madden* Fix" legislation. Ultimately, neither the Financial CHOICE Act of 2017 (H.R. 10), nor the Protecting Consumers Access to Credit Act of 2017 (H.R. 3299, S. 1642) became law.

76.     Despite failing to change the law, Defendants have still not changed their unlawful and usurious practices.[14]

### CLASS ACTION ALLEGATIONS

77.     Plaintiffs bring this action as a class action pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following individuals:

> All individuals residing in New York that have paid interest to Defendants directly or indirectly pursuant to a credit card loan at a rate above 16% at any time since June 12, 2013.

(Collectively referred to herein as the "Class.")

78.     Excluded from the Class are borrowers other than individuals, including but not limited to corporations, LLCs, non-profits and other organizations, and borrowers with credit card

---

[14] A February 2019 article by analysts with Standard & Poors / S&P Global that discussed the *Madden* decision and Colorado's efforts to enforce its usury laws against non-bank entities observed that some recent securitization transactions "excluded those loans made to Colorado residents above the state's usury limits … or with collateral pools that excluded all loans made to Colorado residents."  *See* Chouhan *et al.*, *Marketplace Lending and the True Lender Conundrum*, *available at* https://www.capitaliq.com/CIQDotNet/CreditResearch/Render Article.aspx?articleId=2171229&SctArtId=467289&from=CM&nsl_code=LIME&sourceObject Id=10887397&sourceRevId=1&fee_ind=N&exp_date=20290222-18:32:49 (last visited: May 30, 2019).  The clear implication is that lenders can readily exclude loans that violate state usury rates from their securitization pools if they choose to do so.

loan balances that exceed $250,000.00 or with credit card accounts deemed to be in default.  Also excluded from the Class are Defendants, their subsidiaries, affiliates; officers, directors, legal representatives, and employees; all persons who make a timely election to be excluded from the Class; governmental entities; and any judge to whom this case is assigned and his/her immediate family.  Plaintiffs reserve the right to revise the Class definition based on information learned through discovery.

79.     Class certification is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

80.     Numerosity—Fed. R. Civ. P. 23(a)(1).  The Class is comprised of thousands of individuals who are or were New York credit card account holders, the joinder of which in one action would be impracticable.  The exact number or identification of the Class members is presently unknown.  The identity of the Class members is ascertainable and can be determined based on Defendants' records, records of originator entities, or similar entities and/or public records.

81.     Predominance of Common Questions—Fed. R. Civ. P. 23(a)(2), 23(b)(3).  The questions of law and fact common to the Class predominate over questions affecting only individual Class Members, and include, but are not limited to, the following:

(a)     Whether the Class Members were charged interest at rates above 16%;

(b)     Whether the Defendants received the Class Members payments, directly or indirectly;

(c)     Whether, as a result of Defendants' conduct, Plaintiffs and the Class have suffered injury and, if so, the appropriate relief; and

(d)     Whether Plaintiffs and the Class are entitled to damages and/or punitive damages or other relief.

82.   <u>Typicality—Fed. R. Civ. P. 23(a)(3)</u>.  Plaintiffs' claims are typical of those of the Class in that Plaintiffs, like all Class members, incurred debt and paid interest at rates above the applicable limit.  Plaintiffs have suffered damages in the form of additional interest costs, and such damages are consistent with those suffered by Class Members.

83.   <u>Adequacy—Fed. R. Civ. P. 23(a)(4); 23(g)(1)</u>.   Plaintiffs   are   adequate representatives of the Class because they fit within the class definition and their interests do not conflict with the interests of the members of the Class they seek to represent.  Plaintiffs are represented by experienced Class Counsel.  Class Counsel have litigated numerous class actions, including many class actions involving the financial services industry, and Plaintiffs' counsel intend to prosecute this action vigorously for the benefit of the entire Class.  Plaintiffs and Class Counsel can fairly and adequately protect the interests of all of the members of the Class.

84.   <u>Superiority—Fed. R. Civ. P. 23(b)(3)</u>.  The class action is the best available method for the efficient adjudication of this litigation, because individual litigation of Class Members' claims would be impracticable and individual litigation would be unduly burdensome to the courts. Plaintiffs and the Class have suffered irreparable harm as a result of Defendants' conduct.  Because of the size of the individual Class members' claims, no Class member could afford to seek legal redress for the wrongs identified in this Complaint.  Without the class action vehicle, the Class would have no reasonable remedy and would continue to suffer losses, as Defendants continue to engage in the unlawful and unfair conduct that is the subject of this Complaint, and Defendants would be permitted to retain the proceeds of their violations of law.  Further, individual litigation has the potential to result in inconsistent or contradictory judgments.  A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

85.     Plaintiffs and the Class do not anticipate any difficulty in the management of this litigation.

**FIRST CAUSE OF ACTION**
**New York General Obligations Law § 5-501**
**(Asserted on Behalf of Plaintiffs and the Class)**

86.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing and succeeding paragraphs of this Complaint as if fully set forth herein.

87.     Defendants have violated and continue to violate N.Y. Gen. Obl. Law §5-501 and N.Y. Bank. Law §14-a by charging, collecting, and receiving interest from Plaintiffs and the Class at a rate in excess of the 16% usury limit.

88.     Pursuant to N.Y. Gen. Obl. Law §§5-511 and 5-513, Plaintiffs and the Class are entitled to a declaration that Defendants cannot enforce the usurious contracts, and disgorgement of all sums paid in excess of the usury limit.

**SECOND CAUSE OF ACTION**
**Unjust Enrichment**
**(Asserted on Behalf of Plaintiffs and the Class)**

89.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing and succeeding paragraphs of this Complaint as if fully set forth herein.

90.     As a result of Defendants' unlawful actions described above, Defendants have been and continue to be unjustly enriched at the expense of Plaintiffs and the Class as a result of their payment of excessive and improper interest rates.

91.     Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits that it received from Plaintiffs and the Class.

92.     Defendants should be required to disgorge the monies they have unjustly obtained to the detriment of Plaintiffs and the Class.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray for judgment against Defendants granting the following relief:

a.      An order certifying this case as a class action and appointing Plaintiffs' counsel to represent the Class and Plaintiffs as representatives of the Class;

b.      All recoverable compensatory and other damages sustained by Plaintiffs and the Class;

c.      Actual, treble, punitive, and/or statutory damages for injuries suffered by Plaintiffs and the Class in the maximum amount permitted by applicable law;

d.      An order requiring Defendants to immediately cease their wrongful conduct as set forth above;

e.      Payment of reasonable attorneys' fees and costs as may be allowable under applicable law; and

f.      Such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all causes of action so triable.


Dated:  June 12, 2019                                         Respectfully submitted,




_____

Christian Hudson
C. William Frick
Daniel Cohen
CUNEO, GILBERT & LADUCA, LLP
4725 Wisconsin Avenue NW
Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
Fax: (202) 789-1813
Email: charlesl@cuneolaw.com
Email: bill@cuneolaw.com
Email: christian@cuneolaw.com

Shanon J. Carson
Glen L. Abramson
Patrick F. Madden
BERGER MONTAGUE PC
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Fax: (215) 875-4604
Email: scarson@bm.net
Email: gabramson@bm.net
Email: pmadden@bm.net