UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
WILLIAM COHEN, SUE PAIVANAS, AND
CHRISTY OGRODOSKI, individually and
on behalf of all others similarly
situated,

                                        **MEMORANDUM AND ORDER**

            *Plaintiffs*,

                                        19-cv-3479(KAM)(RLM)

        -*against*-

CAPITAL ONE FUNDING, LLC; CAPITAL
ONE MASTER TRUST; CAPITAL ONE
MULTI-ASSET EXECUTION TRUST; and
THE BANK OF NEW YORK MELLON
CORPORATION, as Trustee of Capital
One Master Trust;

            *Defendants*.
--------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

            Plaintiffs William Cohen, Sue Paivanas, and Christy

Ogrodoski (collectively, "Plaintiffs"), individually, and on

behalf of others similarly situated, bring this action against

Capital One Funding, LLC ("CO Funding"), Capital One Multi-Asset

Execution Trust ("COMET"), and the Bank Of New York Mellon

Corporation ("BONY"), solely in its capacity as Trustee of

Capital One Master Trust ("COMT") (collectively, "Defendants"),

alleging violations of New York usury and banking law, as well

as unjust enrichment.  (ECF No. 34, Amended Complaint ("Compl.")

¶¶ 2, 29.)  Plaintiffs are New York residents with outstanding

loan balances on credit cards that were issued by non-party

Capital One Bank (USA) National Association ("Capital One").

1

(*Id.* ¶¶ 9-22.) Defendants, but notably, not Capital One, are alleged to have charged and received payments from Plaintiffs and other New York consumers at interest rates exceeding New York's 16% usury limit, in violation of New York General Obligation Law § 5-501 and Banking Law § 14-a. (*Id.* ¶¶ 5, 29.) Plaintiffs seek compensatory damages, injunctive relief, and disgorgement of sums paid in excess of the usury limit. (*Id.* ¶ 88.)

Presently before the court is Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The court has considered the submissions of the parties and *amici*. For the reasons set forth below, Defendants' motion is GRANTED, and the Amended Complaint is DISMISSED in its entirety.

**BACKGROUND**

The background information is derived from the well-pleaded factual allegations of the Amended Complaint and other information the court may consider in determining whether the pleading is legally sufficient.

## I. The Amended Complaint

### A. The Parties

Plaintiffs represent a putative class of New York residents who, at any time since June 12, 2013, have paid credit card interest to Defendants at a rate exceeding 16%. (Compl. ¶ 77.) Plaintiffs have paid Defendants interest rates ranging

from 22.5 to 27.74% on their outstanding Capital One credit card balances. (*Id.* ¶¶ 11, 16, 21.) Defendants are primarily entities affiliated with Capital One, as discussed further below. CO Funding is a Virginia Limited Liability Company. (*Id.* ¶ 24.) COMT is a common law trust, with BONY serving as its Trustee. (*Id.* ¶ 25.) COMET is a Delaware Statutory Trust, with Deutsche Bank Trust Company as Trustee, and CO Funding as the beneficiary. (*Id.*) CO Funding, COMT, and COMET are not banks. (*Id.* ¶ 26.)

## B. Credit Card Securitization

Credit card securitization can be summarized as follows: first, a financial institution, such as a bank, designates select credit card accounts;[1] the bank then pools the accounts' receivables, which generally include all payments owed by accountholders, such as principal and interest payments, and payments for all fees, including late fees, over limit fees, and annual fees; finally, the bank sells the receivables to and through shell-company intermediaries, with the receivables ultimately serving as a collateral base to secure bond-like, fixed-income securities issued to investors. (Compl. ¶¶ 31, 43.) The bank ultimately receives the sales proceeds from investors' purchases of the securities. In essence, the

---

[1] The sponsor is usually the bank that originated the credit card accounts, but can also be the bank's affiliate or another entity that purchased receivables from the originator.

securitization allows the bank to transform a pool of credit card receivables into cash. (*Id.* ¶ 35 n.4.)

The "sponsor," usually a bank, initiates securitization by selling the entire balance of receivables arising from select credit card accounts, along with rights to purchase future receivables generated therefrom, to its wholly-owned, special-purpose subsidiary. (Compl. ¶ 32.) The subsidiary, or "depositor," has no assets or liabilities. (*Id.*) It exists to shield the receivables if the sponsor's assets fall under the control of a bankruptcy trustee or FDIC receivership. (*Id.* ¶ 33.) By making the receivables "bankruptcy remote," prospective investors can assess the pooled assets based on their intrinsic value, without regard to the sponsor firm's general operating risks. (*Id.* ¶¶ 33, 37.)

After the initial sale of receivables from sponsor to depositor, the latter sells the pooled receivables and associated rights to a passive, single-purpose entity ("SPE"), typically a trust. (Compl. ¶ 34.) The SPE is legally independent of the sponsor. (*Id.*) The attenuated relationship between the SPE and sponsor further protects the receivables from consolidation into a bankruptcy or FDIC receivership estate. (*Id.*) After the SPE acquires the receivables, it issues certificated securities to the depositor. (*Id.* ¶ 35.) These securities are collateralized, or backed, by the pooled

receivables.  (*Id.*)  The depositor now holds "asset-backed" securities, or ABS.  The depositor then sells the ABS to investors, either through various underwriting affiliates, or by transferring ABS to the sponsor, which, in turn, sells them directly to investors or through underwriters.  (*Id.*)  The depositor pays the sponsor for the initial sale of the receivables with the proceeds from ABS sales.  (*Id.*)

Because the SPE acquires the right to purchase any new receivables, as cardholders' subsequent purchase activity generates more receivables on designated accounts, new receivables are likewise purchased by the SPE through the series of transactions described above.  (Compl. ¶ 36.)  The SPE pays for new receivables with funds from cardholders' principal payments; credit card interest and fees fund the SPE's operating expenses and coupons due to ABS investors.  (*Id.*)  As a passive entity, however, the SPE lacks significant operational capacity— its sole purpose is to purchase receivables and issue securities.  Therefore, a servicing agent, or "servicer," is engaged to manage the receivables on the SPE's behalf, and for the benefit of the ABS investors.  (*Id.* ¶ 37.)  For instance, the servicer sends cardholders their billing statements, and collects their outstanding debt payments.  (*Id.*)  Where, as here, the SPE is a common law trust, the trustee holds legal

title to the receivables, whereas beneficial ownership of the receivables resides with ABS investors.  (*Id.* ¶ 38.)

### C. Capital One Asset-Backed Securities

Plaintiffs opened credit card accounts with Capital One, the ABS sponsor.  (Compl. ¶¶ 40-42; *see also* ECF No. 43-4, Prospectus for Class A(2019-1) Notes, dated February 20, 2019 ("Prospectus").)[2]  Capital One is a national bank located in Virginia.  (ECF No. 43-3, Comptroller of the Currency: Corporate Decision #2007-09 Approving Decision to Convert to National Bank ("OCC Decision"); Prospectus 73,75.)[3]

Pursuant to a Receivables Purchase Agreement, dated August 1, 2002 ("RPA"), Capital One sold credit card receivables to CO Funding.  (Compl. ¶¶ 40-45; *see also* ECF No. 43-2, RPA, p. 1 – Recitals ("Capital One desires to sell and assign, from time to time, certain Receivables to [CO] Funding upon the terms and conditions hereinafter set forth[.]").)  CO Funding, a wholly-owned, operating subsidiary of Capital One, acquired all "right, title and interest, whether now or hereafter acquired, in, to

---

[2]     The Prospectus is also available on the SEC's EDGAR database.  *See* https://www.sec.gov/Archives/edgar/data/922869/000119312519048060/d705467d424b5.htm.  Citations to the Prospectus correspond to ECF, not EDGAR pagination. As discussed below, the Prospectus and other documents cited herein, are integral to the Complaint.

[3]     The Office of the Comptroller of the Currency ("OCC") is "a federal agency that charters, regulates, and supervises all national banks."  *Town of Babylon v. Fed. Hous. Fin. Agency,* 699 F.3d 221, 224 n.2 (2d Cir. 2012).  In October 2007, the OCC approved Capital One's application to convert to a national bank.  The OCC identified Capital One's location as Glen Allen, Virginia.

and under [the credit card receivables]." (Compl. ¶ 44; RPA §§ 2.01(a), (d); Prospectus 21.) CO Funding and Capital One additionally agreed that the transfers of receivables "constitute an absolute sale, conveying good title, free and clear of any liens, claims, encumbrances or rights of others, from Capital One to [CO] Funding." (Compl. ¶ 45; RPA § 2.01(d).)

Once CO Funding acquired the receivables from Capital One, it sold them to COMT pursuant to an Amended and Restated Pooling and Servicing Agreement, originally dated as of September 30, 1993 ("PSA"). (Compl. ¶¶ 47-50; *see also* 43-5, PSA § 2.01(a) (CO Funding "transfers, assigns, sets over and otherwise conveys to [BONY as COMT's Trustee] all of its right, title and interest, whether now owned or hereafter acquired, in, to and under" the credit card receivables).) COMT issued a collateral certificate to COMET, representing an undivided interest in the credit card receivables owned by COMT. (Prospectus 73; Compl. ¶ 54.) The collateral certificate did not, and does not, effect a transfer of the credit card receivables themselves. (*Id.*) Rather, the collateral certificate secures the investors' notes, and also conveys payments from Plaintiffs and other class members from COMT to COMET. (Compl. ¶ 55.) COMET, for its part, sells securities backed by Plaintiffs' and class members' credit card payment

obligations, predicated on its "undivided interest" in the receivables. (*Id.* ¶ 56; *see also* Prospectus 96 ("Each series of investor certificates represents an undivided interest in the master trust, including the right to the applicable investor percentage of all cardholder payments on the receivables in the master trust.").)

COMET, like COMT, is a SPE. It engages exclusively in the purchase of receivables and issuance of debt against payments from class members. (Compl. ¶ 53.) Because COMT and COMET are both "bankruptcy remote" SPEs with no employees, a servicer is needed to manage the credit card receivables. (*Id.* ¶¶ 57, 58.) Capital One acts as the "servicer for [COMET] and is responsible for servicing, managing and making collections on the receivables in the master trust." (Prospectus 21; *see also* PSA §§ 3.01(a)-(b), 4.03(c).) Defendants pay Capital One a servicing fee to manage the accounts. (Prospectus 22; PSA § 3.02.)

Although Capital One transferred the select credit card accounts' receivables, the securitization documents reflect that, at all times, Capital One retained control of the credit card accounts themselves. The Prospectus cover page, for example, states that "[t]he assets of [COMT] primarily include receivables arising in credit card accounts *owned by* Capital One Bank[.]" (Prospectus 1 (emphasis added).) The PSA likewise

confirms Capital One's continued ownership of the credit card accounts. (PSA § 1.01 ("'Account Owner' shall mean Capital One[.]").) The RPA and Prospectus further recognize that Capital One retains authority to modify the terms and provisions of the credit card accounts, including the interest rate charged to borrowers. (RPA § 5.01(i) ("Capital One may change the terms and provisions of the applicable Lending Agreements or the applicable Lending Guidelines in any respect (including the calculation of the amount or the timing of charge-offs and the Periodic Rate Finance Charges to be assessed thereon)."); Prospectus 63 ("As owner of the accounts, [Capital One] retain[s] the right to change various terms and conditions of those accounts, including finance charges and other fees they charge and the required minimum monthly payment."); *id.* 64 ("[Capital One] and its affiliates have no restrictions on their ability to change the terms of the accounts except as described" in the Prospectus).) The Prospectus also advises ABS investors that Capital One will maintain control of the credit card accounts and customer relationships. (*Id.* 94 ("Notwithstanding this designation [of identified pool of select accounts] to the transferor, the designated accounts and the account relationship with the cardholders will remain with the bank.").)

## II.   **The Instant Motion**

Plaintiffs filed the Amended Complaint on September 11, 2019.  Defendants subsequently moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  (ECF No. 43, Motion to Dismiss ("Mot.").)[4]  Defendants contend that Plaintiffs' claims are preempted by the National Bank Act ("NBA"), 12 U.S.C. § 1, *et seq.*  The NBA permits national banks to "charge on any loan . . . interest at the rate allowed by the laws of the State, Territory, or District where the bank is located."  12 U.S.C. § 85.  Capital One is located in Virginia, which does not impose any relevant limits to the interest rates that a national bank may charge.  *See* Va. Code § 6.2-313.  Under the NBA, Capital One—as a national bank—may therefore extend credit to consumers as Virginia law allows, that is without usury limits, and without regard to the consumer's place of residence, so long as the interest rate is disclosed and agreed to by the borrower.  The NBA preempts state law usury claims asserted against national banks.  This much is not disputed.

The motion hinges on the *relevance* of Capital One's status as a national bank, and moreover, its relationship to the credit card accounts from which the ABS derives its main assets,

---

[4]     Plaintiffs opposed Defendants' motion on October 18, 2019 (ECF No. 47, Memorandum in Opposition of Motion to Dismiss ("Opp.").)  Defendants served their reply on November 1, 2019.  (ECF No. 49, Defendants' Reply ("Reply").)

the receivables.  In the main, Defendants contend the NBA preempts Plaintiffs' state law usury claim because it is Capital One, not Defendants, which owns the ABS's underlying credit card accounts.  In essence, Defendants maintain Capital One is the real party-in-interest, and as a national bank, is not subject to a state law cause of action for usury.  Plaintiffs, on the other hand, reject that Capital One's status has any bearing at the pleading stage.  Plaintiffs did not name Capital One as a Defendant, did not allege that Capital One maintained control and ownership of Plaintiffs' credit card accounts, and the Defendants themselves are not national banks.  (Opp. 7-11.) Therefore, Plaintiffs contend that facts relating to non-party Capital One cannot support Defendants' preemption defense in a Rule 12(b)(6) context.  Plaintiffs further assert that, even if such facts could be appropriately considered at the pleading stage, applying New York state usury law would not significantly interfere with Capital One's powers as a national bank, a requisite for federal preemption under these circumstances. (*Id.* 11.)

The Defendants' motion also centers on the parties' dueling interpretations of *Madden v. Midland Funding, LLC*, decided by the Second Circuit in 2015.  *See* 786 F.3d 246 (2d Cir. 2015).  In *Madden*, a credit card customer's usury claim against a debt collector, which had purchased plaintiff's debt

from national banks, survived NBA preemption.  Critically, the defendants in *Madden* purchased plaintiff's debt outright from the national banks.  To Plaintiffs, *Madden* stands for the simple proposition that "non-bank debt purchasers like Defendants cannot avail themselves of the National Bank Act to evade liability for charging usurious interest rates."  (Opp. 1.) Plaintiffs contend that *Madden* is on-point and fatal to Defendants' motion.

Defendants argue the instant facts are distinguishable from *Madden*.  (Mot. 10.)  Far from selling its interests or ownership rights in the underlying credit card accounts, like the banks in *Madden*, Capital One remained both the real party-in-interest and legal owner of the credit card loans through each step of securitization.  (*Id.*)  Defendants therefore assert that Capital One permissibly "exported" the non-limits of Virginia's usury law to other jurisdictions in which it extended credit, including New York.  Defendants also note that NBA preemption extends to non-bank entities where application of state law would significantly interfere with the authorized activities of a national bank—such as setting interest rates on loans—a standard codified by the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), 12 U.S.C. § 25b(b)(1)(B).  (*Id.* 8.)

In the alternative, Defendants argue that Plaintiffs' usury claim fails under New York state's "valid when made" rule. (Mot. 16.) According to Defendants, this doctrine holds that valid interest rates charged at a loan's inception are not transformed into usurious rates based on subsequent events. (*Id.* 2.) Here, Capital One charged Plaintiffs interest rates that were valid at the time of origination under Virginia law. The subsequent securitization of receivables arising from Plaintiffs' loans, Defendants insist, does not convert the interest rates validly charged at origination into usurious rates. (*Id.* 16-19.) Defendants also urge the court to dismiss Plaintiffs' second cause of action for unjust enrichment, as derivative and duplicative of the Amended Complaint's usury claim. (*Id.* 19.)

There have also been numerous supplemental filings, beyond the parties' moving papers. The Bank Policy Institute ("BPI") and Structured Finance Association ("SFA") jointly submitted an *amicus curiae* brief in support of Defendants' motion. (ECF No. 46, BPI/SFA *Amicus* Brief in Support of Motion to Dismiss.) The *amici* attempt to bolster Defendants' case by describing securitization's critical role and function in the field of banking, and warn that allowing state usury laws to trump the NBA would significantly impair and upend lending markets, which rely on the continued application of NBA

preemption to securitizations.  (*Id.* 20, 23.)  Plaintiffs
dismiss the BPI/SFA brief as a mere regurgitation of Defendants'
motion, and reject *amici*'s commentary on securitization as
speculative and irrelevant.  (ECF No. 48, Plaintiffs' Opposition
to BPI/SFA *Amicus* Brief 7.)

Defendants further supplemented their briefing with
additional authority, namely, a Report and Recommendation
("R&R") by Magistrate Judge Jeremiah J. McCarthy in a similar
case, currently pending in the Western District of New York.
(ECF No. 51 (appending R&R issued in *Petersen v. Chase Card
Funding, LLC*, No. 19-CV-00741-LJV-JJM, 2020 WL 613531 (W.D.N.Y.
Jan. 22, 2020)).)[5]  *Petersen* also involves usury allegations
arising from the securitization of receivables for loans
originated by a non-party national bank.  *See generally
Petersen*, 2020 WL 613351.  Judge McCarthy recommended the
complaint be dismissed, reasoning that New York's usury law was
preempted by the NBA, owing to the originator's status as a
national bank, and because applying New York's usury law would
significantly interfere with the national bank's ability to sell
or assign receivables.  *Id.* at *4.  Accordingly, Judge McCarthy
determined that the third-party non-bank defendants permissibly

---

[5]    Plaintiffs' attorneys are counsel of record to the plaintiff in
*Petersen*.

charged plaintiff interest rates in excess of New York's usury limits.

Two consumer rights organizations, the National Consumer Law Center ("NCLC") and the Center for Responsible Lending ("CRL"), filed a separate *amicus* brief to address the *Petersen* R&R, as well as the broader implications of the instant suit. *Amici* take particular issue with Judge McCarthy's holding that denying national banks the ability to export home state interest rates would inhibit the capacity of banks to sell or assign the receivables from credit card accounts. *See Petersen*, 2020 WL 613531, at *4. *Amici* express concern that the R&R implies "state usury laws do not apply to assignees of bank loans." (ECF No. 51-1, *Amicus* Brief in Response to Magistrate Judge's Report and Recommendation ("NCLC/CRL *Amicus* Br.") 6.) Although *amici* proclaim neutrality, they warn that a sweeping ruling in Defendants' favor may have unintended consequences. Specifically, *amici* worry that predatory lenders will opportunistically use national banks to nominally originate loans, solely to avail themselves of lax usury limits in the bank's home jurisdiction, and thereby evade local usury laws. (*Id.* 4.)

On April 29, 2020, Plaintiffs also provided the court with the NCLC and CRL's *amicus* brief filed in the *Petersen* case, in response to Judge McCarthy's R&R. (ECF No. 52, *Amicus* Brief

in Response to *Petersen* Report and Recommendation, dated Feb. 7, 2020 ("NCLR/CLR *Amicus* (R&R)").) In that submission, *amici* register two objections to the R&R: (1) Judge McCarthy ignored *Madden* by concluding that, where the loan originator is a national bank, the NBA preempts usury limits on interest rates charged by non-bank assignees of those loans; and (2) Judge McCarthy erred by holding that application of state usury laws would prevent the exercise of the national bank's powers. (*Id.* 5.) On September 21, 2020, Judge Lawrence J. Vilardo adopted Judge McCarthy's R&R, and dismissed the *Petersen* plaintiff's complaint. *See Petersen*, 2020 WL 5628935, at *1 (W.D.N.Y. Sept. 21, 2020).

## LEGAL STANDARD

### I.  Motion to Dismiss

In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) (citations omitted). Although detailed factual allegations are not required, the pleading standard set forth in Fed. R. Civ. P. 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

555 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' . . . Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Id.* Moreover, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotations and citations omitted).

In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The court may also consider documents the plaintiff relied on in bringing suit, and which are either in the plaintiff's possession, or that the plaintiff knew of when bringing suit. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Cortec Indus., Inc. v. Sum Holding*

*L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992); *McKevitt v. Mueller*, 689 F. Supp. 2d 661, 665 (S.D.N.Y. 2010). Where the complaint cites or quotes from excerpts of a document, the court may consider other parts of the same document submitted by the parties on a motion to dismiss. *131 Main St. Assocs. v. Manko*, 897 F. Supp. 1507, 1532 n. 23 (S.D.N.Y. 1995). If "the documents contradict the allegations of a plaintiff's complaint, the documents control and the [c]ourt need not accept as true the allegations in the complaint." *2002 Lawrence R. Buchalter Alaska Tr. v. Philadelphia Fin. Life Assurance Co.*, 96 F. Supp. 3d 182, 199 (S.D.N.Y. 2015) (quoting *Bill Diodato Photography LLC v. Avon Prods., Inc.*, No. 12-CV-847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012) and collecting authorities).

## II.  Preemption

Principles of federalism recognize that "both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012) (citations omitted). Under the Supremacy Clause of the United States Constitution, "state laws that conflict with federal law are without effect" and are preempted. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (citation and quotation omitted); U.S. Const., art. VI, cl. 2. In addressing preemption questions, "the purpose of Congress is the ultimate

18

touchstone." *Wyeth v. Levine*, 555 U.S. 555, 564 (2009) (citation and quotation omitted). "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose." *Altria*, 555 U.S. at 76 (citation omitted).

State law is preempted by federal law "(1) where Congress has expressly preempted [it], (2) where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law, or (3) where federal law conflicts with state law." *Baldanzi v. WFC Holdings Corp.,* No. 07 CIV 9551 (LTS) (GWG), 2008 WL 4924987, at *1 (S.D.N.Y. Nov. 14, 2008) (quoting *Wachovia Bank, N.A. v. Burke,* 414 F.3d 305, 313 (2d Cir. 2005)). Therefore, preemption is essentially a question of congressional intent. *See Altria,* 555 U.S. at 76 ("[T]he purpose of Congress is the ultimate touchstone in every pre-emption case.").

Preemption is an affirmative defense. At the pleading stage, preemption constitutes grounds for dismissal only "if the statute's barrier to suit is evident from the face of the complaint." *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015). "A district court may grant a motion to dismiss based on federal preemption, if the defense can easily be determined from the pleadings." *Aaronson v. Am. Med. Sys., Inc.*, No. 09-CV-2487 (NGG), 2010 WL 3603618, at *1 (E.D.N.Y.

Sept. 7, 2010) (internal citation and quotation marks omitted);
*see also Farash v. Cont'l Airlines, Inc.*, 574 F. Supp. 2d 356,
362-63 (S.D.N.Y. 2008), *aff'd*, 337 Fed. App'x 7 (2d Cir. 2009).
The factual allegations relevant to preemption must be construed
in the light most favorable to the plaintiff. *Galper v. JP
Morgan Chase Bank, N.A.*, 802 F.3d 437, 444 (2d Cir. 2015).

## DISCUSSION

### I. Facts Considered at the Pleading Stage

As a threshold matter, the court addresses which
materials it may properly consider in disposing of Defendants'
motion under Rule 12(b)(6). It is not a stretch to say that
extrinsic documents, specifically the Prospectus, PSA, and RPA,
form the backbone of Plaintiffs' allegations. For example, the
Amended Complaint relies on the Prospectus to diagram the
relevant securitization transactions and identify each
Defendant's role in the process. (*See, e.g.*, Compl. ¶ 40 ("The
diagram below, from a February 20, 2019 prospectus for notes
issued by Defendant COMET, outlines the way credit card loan
payments are obtained by Defendants.").) Allegations regarding
the "free and clear" transfer of receivables from Capital One to
CO Funding, and then by CO Funding to COMT, are based on the
provisions of the PSA and RSA. (*See, e.g.*, *id.* ¶¶ 45, 49
(citing RSA § 2.01(d) & PSA § 2.01).) In other words, the
allegations regarding Defendants' roles in the securitization,

and their potential liabilities, derive from the Prospectus, PSA, and RSA. Without question, these documents are integral to the Amended Complaint. *Chambers*, 282 F.3d at 153 (document appropriately considered at 12(b)(6) stage where the complaint "relies heavily upon its terms and effect, which renders the document integral to the complaint.") (citation and internal quotation marks omitted).

Nonetheless, Plaintiffs assert the court may look no further than the four corners of the Amended Complaint. Plaintiffs seek to cabin any reference to the Prospectus, PSA, and RSA to those select provisions quoted in the pleading. For example, Plaintiffs insist that factual assertions about Capital One's ownership of the underlying credit card accounts, servicing activities for COMT, *i.e.* managing and collecting receivables, and administrative duties for COMET, may not be raised at the pleading stage. (Opp. 8-11.) Because these documents are integral to the Amended Complaint, however, Plaintiffs' contentions are unavailing.

Facts drawn from integral documents, even those not expressly incorporated by reference, are fair game in the context of a Rule 12(b)(6) motion. Affording such documents their due consideration, "prevents plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting." *Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458

F.3d 150, 157 (2d Cir. 2006) (citation omitted); *see also*
*Matusosky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y.
2002) ("If a plaintiff's allegations are contradicted by [ ] a
document [attached to or incorporated by reference into the
complaint], those allegations are insufficient to defeat a
motion to dismiss.").  It seems Plaintiffs wish to minimize, if
not ignore, Capital One's role in the securitization, for
reasons that become clear with further examination of relevant
case law, discussed further below.  Defendants would be
prejudiced were Plaintiffs allowed to freely utilize the
Prospectus, RPA, and PSA in drafting the Amended Complaint,
while omitting critical facts about Capital One, only to turn
around and disavow those very same documents when cited to
Plaintiffs' disadvantage.  More generally, judicial resources
would be wasted, and cases needlessly prolonged in discovery,
were courts to blind themselves to integral documents that
plainly undermine, or even flatly contradict, the allegations
based on those very documents.

        The court may also take judicial notice of the OCC
Decision converting Capital One into a national bank located in
Virginia.  Under Federal Rule of Evidence 201, a court may take
judicial notice, at "any stage of the proceeding," of any fact
"that is not subject to reasonable dispute because" it "can be
accurately and readily determined from sources whose accuracy

cannot reasonably be questioned." Fed. R. Evid. 201(b)(2), (d).

When considering a Rule 12(b)(6) motion, the court may take

judicial notice of certain matters of public record without

converting the motion into one for summary judgment. *See, e.g.*,

*Tellabs*, 551 U.S. at 322 ("[C]ourts must consider the complaint

in its entirety, as well as . . . documents incorporated into

the complaint by reference, and matters of which a court may

take judicial notice."); *Staehr v. Hartford Fin. Servs. Grp.*,

547 F.3d 406, 426 (2d Cir. 2008) ("[M]atters judicially noticed

by the District Court are not considered matters outside the

pleadings.") (citation omitted). OCC actions constitute factual

matters appropriately noticed under Rule 201 and may be

considered by the court at the pleading stage. *See Hite v.*

*Wachovia Mortg.*, No. 2:09-cv-02884-GEB-GGH, 2010 U.S. Dist.

LEXIS 57732, at *6 (E.D. Cal. June 10, 2010) (letter from the

Comptroller of the Currency confirming Wachovia's conversion to

national bank was properly subject to judicial notice on motion

to dismiss); *cf. Holland v. JPMorgan Chase Bank, N.A.*, No. 19

CIV. 00233 (PAE), 2019 WL 4054834, at *5 (S.D.N.Y. Aug. 28,

2019) (taking notice of OCC enforcement actions).

## II. Plaintiffs' Usury Claim is Preempted

### A. Statutory Framework

#### 1. Usury under New York and Virginia Law

Under Virginia state law, there is no usury limit as long as the interest rate is disclosed and agreed to by the borrower. Va. Code § 6.2-313A ("Notwithstanding any statutory or case law, any bank or savings institution may impose finance charges and other charges and fees at such rates and in such amounts and manner as may be agreed by the borrower under an open-end credit plan."). New York's "civil usury cap" prohibits charging interest on a "loan or forbearance" at a rate above 16% annually. *See* N.Y. Gen. Oblig. Law § 5-501(1)-(2); N.Y. Banking Law § 14-a(1). New York's "criminal usury cap" makes it a felony to knowingly charge or collect interest on a "loan or forbearance" at a rate above 25% annually. *See* N.Y. Penal Law § 190.40.

## 2. The National Bank Act

The NBA authorizes national banks to "charge on any loan . . . interest at the rate allowed by the laws of the State, Territory, or District where the bank is located." 12 U.S.C. § 85; *see Pac. Capital Bank N.A. v. Connecticut,* 542 F.3d 341, 352 (2d Cir. 2008) ("[A] state in which a national bank makes a loan may not permissibly require the bank to charge an interest rate lower than that allowed by its home state."); *Marquette Nat. Bank of Minneapolis v. First of Omaha Serv. Corp.,* 439 U.S. 299, 318 (1978) (finding that the NBA authorized a national bank based in one state to charge its out-of-state

credit card customers a higher interest rate on unpaid balances
allowed by its home state).  Section 86 of the NBA "provide[s]
the exclusive cause of action" for usury claims against national
banks.  *Beneficial Nat'l Bank v. Anderson,* 539 U.S. 1, 11 (2003)
(citing 12 U.S.C. § 86); *see Sullivan v. Am. Airlines, Inc.,* 424
F.3d 267, 275 (2d Cir. 2005) (holding that the NBA "therefore
completely preempt[s] analogous state-law usury claims."); *Rubin
v. Hodes*, No. 18-CV-7403 (SJF) (AKT), 2020 WL 132352, at *8 n.9
(E.D.N.Y. Jan. 13, 2020).  Sections 85 and 86 of the NBA
completely preempt state usury law with respect to both the
permissible interest rate lenders may charge, and the remedy
for usury.  *See Beneficial,* 539 U.S. at 11 ("Because §§ 85 and
86 provide the exclusive cause of action for [usury claims
against a national bank], there is, in short, no such thing as a
state-law claim of usury against a national bank."); *see also
Pac. Capital Bank*, 542 F.3d at 352 ("[A] state in which a
national bank makes a loan may not permissibly require the bank
to charge an interest rate lower than that allowed by its home
state.").

### 3. The Dodd-Frank Act

In the context of the NBA, Dodd-Frank provides that
state laws are preempted if they "prevent[ ] or significantly
interfere[ ] with the exercise by the national bank of its
powers."  12 U.S.C. § 25b(b)(1)(B).  This provision of Dodd-

Frank codified the legal standard for preemption set forth by the Supreme Court in its 1996 decision, *Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner*, 517 U.S. 25.  12 U.S.C. § 25b(b)(1)(B).  Congress also expressly provides that "[n]o provision of [the Dodd-Frank Act] shall be construed as altering or otherwise affecting the authority conferred by . . . 12 U.S.C. § 85 for the charging of interest by a national bank . . . ."  12 U.S.C. § 25b(f).  In other words, Dodd-Frank did not upend the authority of national banks to export interest rates under the NBA.

### B. Applying New York Law Would Significantly Interfere With Capital One's Powers Under the NBA

"In certain circumstances, NBA preemption can be extended to non-national bank entities."  *Madden*, 786 F.3d at 250.  "To apply NBA preemption to an action taken by a non-national bank entity, application of state law to that action must significantly interfere with a national bank's ability to exercise its power under the NBA."  *Id.*; *see also Pac Capital Bank*, 542 F.3d at 352-53 ("A state statute that forbade national banks to exercise their incidental powers through agents would thus plainly be preempted. We think it equally plain that a state statute cannot be allowed to avoid preemption by imposing such a prohibition indirectly."); *State Farm Bank v. Reardon*, 539 F.3d 336, 345–46 (6th Cir. 2008) ("[W]hen considering

whether a state law is preempted by federal banking law, the courts should focus on whether the state law is regulating 'the exercise of a national bank's power' not on whether the entity exercising that power is the bank itself.") (citation omitted).

Capital One, a national bank, owns and controls the credit card accounts that generate the receivables at issue, which, in turn, collateralize the ABS and fund payments to ABS investors. Capital One maintains the authority to modify terms and provisions of the underlying customer loans, including the interest rate and fees charged to the credit card holders. Although receivables generated by the credit card accounts are transferred to, and collected by Defendants, only Capital One is vested with authority to determine the total receivables that each account yields, based on the interest rate it sets, and the fees it charges.

Capital One exercises these powers pursuant to authority granted by the NBA, which expressly permits Capital One to "charge on any loan . . . interest at the rate allowed by the laws of the State, Territory, or District where the bank is located." 12 U.S.C. § 85. Banking regulations recognize Capital One's authority, as a national bank, to make "loans without regard to state law limitations concerning . . . [t]he terms of credit, including the schedule for repayment of principal and interest . . . ." 12 C.F.R. § 7.4008(d)(4). By

vesting national banks, like Capital One, with this authority, the NBA "facilitates [their] ability to operate lending programs on a nationwide basis, a characteristic fundamental to national banks since their inception[.]" *Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred*, 85 Fed. Reg. 33530-01, 2020 WL 2836957 (Jun. 2, 2020) (now codified at 12 C.F.R. § 7.4001(e)). Plaintiffs do not dispute that the NBA and banking regulations unambiguously foreclose the application of New York usury limits to Capital One directly.

Under the circumstances, subjecting Defendants to interest rate limits imposed by New York law would significantly interfere with Capital One's exercise of its power as a national bank. The RPA defines "Receivables" as "amounts shown on *Capital One*'s records as amounts payable by [borrowers] on any Account," including principal and various fees and charges. (RPA § 1.01, pp. 5, 8.) "Accounts" are lending agreements between Capital One and any borrower. (*Id.*, pp. 1, 2, 5, 8.) As the "Account Owner," Capital One retained the contractual lending relationship with the credit card borrowers and controlled the interest rate charged to their accounts. (*See* PSA § 1.01; RPA § 5.01(i).) Simply put, Capital One's credit card accounts generate the receivables in question, which are the by-product of terms and conditions that Capital One puts in place for those accounts.

Moreover, Plaintiffs do not allege that Defendants, which are non-bank SPEs with no employees, possess executive authority to set the interest rates or fees paid by borrowers, or otherwise determine the amount of receivables the borrowers' accounts generate.[6]  The receivables are merely transferred to, and collected on behalf of Defendants, in order to collateralize the ABS and fund investor coupons.  If those receivables, which result from terms set by Capital One, must conform to New York's interest rate limits, then it is Capital One—the real party-in-interest—and not Defendants, that will be compelled to modify the terms applicable to the respective credit card accounts. Specifically, if Capital One wished to sustain the commonplace banking practice of securitizing its receivables, then for all practical purposes, it would be forced to conform the interest rates charged to credit card customers within limits imposed under New York law, as well as any other jurisdiction in which Defendants collect receivables, in lieu of Virginia law, contrary to what the NBA allows.  Thus, absent preemption, exposing Defendants to liability under New York usury law would significantly interfere with Capital One's authority to make "loans without regard to state law limitations" governing the

---

[6]     Plaintiffs allege in conclusory fashion that Defendants "charge" usurious interest rates (¶ 2), but nothing in the Amended Complaint or supporting documents establishes that CO Funding, COMET, or COMT have the authority to set interest rates or impose fees on the underlying credit card accounts.

terms of credit and repayment of interest, and would frustrate Capital One's "ability to operate lending programs on a nationwide basis." *See* 12 C.F.R. § 7.4008(d)(4); 85 Fed. Reg. 33530-01.

Relatedly, exposing Defendants to liability under New York's usury law would also intrude on Capital One's authority to "discount[] and negotiat[e] promissory notes, drafts, bills of exchange, and other evidences of debt." 12 U.S.C. § 24 (Seventh). That power includes the power to sell interests in loan contracts. *See* 12 C.F.R. § 7.4008(a) ("A national bank may make, sell, purchase, participate in, or otherwise deal in loans . . . subject to such terms, conditions, and limitations prescribed by the Comptroller of the Currency and any other applicable Federal law."). The court agrees with Defendants' assessment that the application of state usury laws to securitized credit card receivables would compel Capital One to either forego securitization altogether, or else modify interest rates on a state-by-state basis. (*See* Opp. 13.) This result would significantly interfere with Capital One's ability to access "reliable, inexpensive funding in order to make credit card loans," a need that securitization fills "by enabling card issuers to tap capital markets for funding, rather than relying on deposits." Adam J. Levitin, *Skin-in-the-Game: Risk Retention*

*Lessons from Credit Card Securitization*, 81 Geo. Wash. L. Rev.
813, 827 (2013).

In sum, applying state law usury limits to Defendants'
collection of receivables would significantly interfere with
Capital One's NBA powers, and justifies NBA preemption. *See*
*Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 283
(6th Cir. 2009) ("[T]he level of 'interference' that gives rise
to preemption under the NBA is not very high."). Indeed, there
is no question that Plaintiffs' usury claim would be preempted
as against Capital One, if it were a named Defendant.
Plaintiffs' decision not to name Capital One as a Defendant does
not produce a different outcome. National banks, such as
Capital One, securitize their credit card receivables to convert
those assets into cash proceeds, and access the liquidity needed
to fund further credit card lending. Here, Defendants
facilitated that goal for Capital One by, *inter alia*, cordoning
the receivables off from Capital One's general operating risks,
making the assets "bankruptcy remote" and thus, more attractive
to investors. Although Defendants are not national banks, the
Amended Complaint and documents on which it relies clearly show
that Defendants were either subsidiaries of Capital One, as with
CO Funding, or else "carrying out" Capital One's business. *See*
*Edwards v. Macy's Inc.*, No. 14 CIV. 8616(CM), 2016 WL 922221, at

*7 (S.D.N.Y. Mar. 9, 2016) (Rule 12(b)(6) dismissal of state law claims preempted by NBA).

At bottom, it is apparent from the Amended Complaint, and its integral documents, that the NBA preempts Plaintiffs' state law usury claims. Applying New York's usury limits would significantly interfere with Capital One's ability to exercise its power to charge interest on the loans it issues, to sell interests in loan contracts, and to participate in the securitization market. Federal courts routinely dismiss state law claims under Rule 12(b)(6) where NBA preemption is apparent from the pleadings. *See, e.g.*, *Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1198 (11th Cir. 2011) (affirming dismissal under Rule 12(b)(6), holding that enforcement of state statute would conflict with national bank's authority to charge fees); *Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032, 1038 (9th Cir. 2008) (affirming Rule 12 dismissal of California's Unfair Competition Law claims based on NBA preemption); *In re TD Bank, N.A.*, 150 F. Supp.3d 593, 611 (D.S.C. 2015) (granting Rule 12(b)(6) motion, in part, and stating "where the plaintiff's claims touch upon functions central to the business of banking (e.g. . . . pricing decisions) and seek to substitute state law as a measure of the propriety of the bank's actions within those central functions, the interference posed by the state law is

deemed *significant* and therefore preempted") (emphasis in original).

Before moving on to Plaintiffs' second cause of action, unjust enrichment, the court feels it necessary to examine the Second Circuit's decision in *Madden*. Although *Madden*'s reasoning provides a helpful guidepost for NBA preemption analysis, it is ultimately distinguishable. Contrary to Plaintiffs' insistence that *Madden* necessitates denying Defendants' motion to dismiss, the Second Circuit's reasoning actually supports granting the motion and dismissing the Complaint.

### C. *Madden* Supports Dismissal of this Action

Plaintiffs contend that *Madden* determined "non-bank debt purchasers like Defendants cannot avail themselves of the National Bank Act to evade liability for charging usurious interest rates." (Opp. 1.) This overstates *Madden*'s reach. In *Madden*, the plaintiff sued debt collector Midland Funding, LLC ("Midland") and its affiliate, under New York's usury law. Midland had purchased plaintiff's debt from FIA Card Services, N.A. ("FIA"), which had previously acquired plaintiff's debt from Bank of America ("BoA"). 786 F.3d at 247-48. BoA and FIA are both national banks. *Id.* The plaintiff claimed that Midland ran afoul of New York's usury law by charging interest in excess of the state limit. *See id.* at 247. Midland, which

was not a national bank, argued that the NBA preempted the state law usury claim because Midland acquired plaintiff's credit card loan from a national bank that was entitled to charge an interest rate in excess of New York's usury limit. *Id.* at 250.

The Second Circuit disagreed. The court observed that, although NBA preemption was available to non-national bank entities where the application of state law risked significantly interfering with a national bank's powers, it had usually been in circumstances where the non-bank entity "acted on behalf of a national bank in carrying out the national bank's business." *Madden*, 786 F.3d at 251. That was not the case with Midland and its affiliate, which were acting "solely on their own behalves, as the owners of the debt," and not on behalf of BoA and FIA. *Id.*

*Madden* is readily distinguishable from the present circumstances. In contrast to *Madden,* where plaintiff's account was sold outright to a non-bank debt collector, Capital One retains ownership and control of the relevant credit card accounts. (*E.g.*, Prospectus 63.) Indeed, the sponsor bank's continued ownership of its debtors' accounts, despite assigning the accounts' receivables, is a hallmark of credit card securitization. *See* Fed. Deposit Ins. Corp., Credit Card Securitization Manual 10-11 (2007), https://www.fdic.gov/regulations/examinations/credit_card_securi

[tization/pdf_version/ch2.pdf](tization/pdf_version/ch2.pdf) ("In a credit card securitization transaction only the receivables are sold, not the accounts that generate the receivables. The financial institution retains legal ownership of the credit card accounts and can continue to change the terms on the accounts.").[7]  As NCLC and CLR intimate in their *amicus* brief, there are "key differences between, on the one hand, the assignment of receivables in an active bank lending program in which the bank is a real party in interest, and, on the other, the assignment of charged-off debt to debt buyers, as the court in *Madden* itself noted."  (NCLC/CRL *Amicus* Br. 7.)

Capital One's role as ABS sponsor and servicer, and retention of ownership and control over the underlying credit card loans (*see, e.g.*, Prospectus 21; PSA §§ 3.01(a)-(b), 3.02, 4.03(c)), is not analogous to *Madden*, where BoA and FIA severed their contractual ties to plaintiff's debt.  The centrality of

---

[7]     *See Am. Exp. Bank FSB v. Najieb*, 125 A.D.3d 470, 471 (N.Y. App. Div. 1st Dept. 2015) ("The securitization of plaintiff credit card issuer's receivables did not divest it of its ownership interest in the account, and therefore did not deprive it of standing to sue to recover defendant's overdue credit card payments."); *Willard v. Bank of Am.,* 204 F. Supp. 3d 829 (E.D. Pa. 2016) (holding credit card issuer did not relinquish its interest in credit card account by securitizing its credit card receivables and transferring them to a trust); *Davidson v. Capital One Bank (USA), N.A.*, 44 F. Supp. 3d 1230, 1243 (N.D. Ga. 2014) ("Plaintiff's understanding of securitization is incorrect. The  securitization of receivables does not change the relationship between a debtor and creditor."), *aff'd*, 797 F.3d 1309 (11th Cir. 2015); *Bhatti v. Guild Mortgage Co.*, No. 11-0480, 2011 WL 6300229, at *5 (W.D. Wash. Dec. 16, 2011) ("Securitization merely creates a separate contract, distinct from the Plaintiffs' debt obligations under the Note, and does not change the relationship of the parties in any way."), *aff'd in part*, 550 Fed. App'x 514 (9th Cir. 2013).

this fact caused the Second Circuit to distinguish, but not reject, two notable Eighth Circuit decisions: *Krispin v. May Dept. Stores, Inc.,* 218 F.3d 919 (8th Cir. 2000), and *Phipps v. FDIC,* 417 F.3d 1006 (8th Cir. 2005). Although neither *Krispin* nor *Phipps* are controlling law, both cases are persuasive, and worth examining in detail.[8]

In *Krispin*, May Department Stores Company ("May Stores"), a non-bank entity, issued credit cards to the plaintiffs. 218 F.3d at 921. The credit card accounts were governed by Missouri law, which limits delinquency fees to $10. *Id.* May Stores thereafter assigned and transferred the accounts to May National Bank of Arizona ("May Bank"), a national bank and wholly-owned subsidiary of May Stores, and further notified plaintiffs that May Bank would charge delinquency fees of up to "$15, or as allowed by law." *Id.* Although May Stores had transferred all authority over the terms and operations of the accounts to May Bank, it subsequently purchased May Bank's receivables and maintained a role in account collection. *Id.* at 923. Plaintiffs thereafter sued May Stores for charging fees in

---

[8]     Plaintiffs' suggestion that *Krispin* and *Phipps* have been superseded by Dodd-Frank has no purchase. (*See* Opp. at 17.) As noted above, Dodd-Frank merely codified the conflict preemption principles espoused by the Supreme Court in *Barnett Bank*—decided four years before *Krispin*, and nine years before *Phipps*—as the "governing standard for national bank preemption." *See* Dodd-Frank Final Rule, 76 Fed. Reg. 43549-01 (Jul. 21, 2011); *see also Hymes v. Bank of Am., N.A.,* 408 F. Supp. 3d 171, 198 n.18 (E.D.N.Y. 2019) ("The test for NBA preemption has been the same since at least 1996, when the Supreme Court decided *Barnett Bank*. Although this Court's application of the test has been informed by Dodd-Frank, it has not depended on it.").

excess of the limit under Missouri's usury law.  *Id.* at 922.
May Stores argued that the plaintiffs' state law claims were
preempted by the NBA because the assignment and transfer of the
accounts to May Bank "was fully effective to cause the bank, and
not the store, to be the originator of [the plaintiffs']
accounts subsequent to that time."  *Id.* at 923.

The Eighth Circuit agreed.  May Store's purchase of
receivables from May Bank did "not diminish the fact that it is
now the bank, and not the store, that issues credit, processes
and services customer accounts, and sets such terms as interest
and late fees."  *Krispin*, 218 F.3d at 924.  The Eighth Circuit
held that, even though the NBA ostensibly "governs only national
banks," the circumstances warranted "look[ing] to the
originating entity (the bank), and not the ongoing assignee (the
store), in determining whether the NBA applies."  *Id.* at 924
(internal citation omitted).

In *Phipps*, plaintiffs initiated suit in Missouri state
court to recover fees charged on second mortgage loans by
Guaranty National Bank of Tallahassee ("GNBT"), a federally
chartered national bank.  *Phipps,* 417 F.3d at 1008-09.  The
plaintiffs also claimed the loan origination and loan discount
fees charged by GNBT were actually "finder's fees" paid to a
third party, non-bank Equity Guaranty LLC ("Equity").  *Id.* at
1009.  According to plaintiffs, defendants' actions violated the

Missouri Second Mortgage Loan Act.  Defendants removed the case to federal court.  The district court denied plaintiffs' subsequent motion to remand.

In affirming the district court, the Eighth Circuit agreed that the fees at issue conformed to the OCC's definition of interest, and therefore, plaintiffs had actually asserted a claim for excessive interest, *i.e.* usury.  Because the NBA completely preempted state law claims challenging interest charged by national banks, and the alleged unlawful fees qualified as interest under the NBA, both the removal and dismissal of the plaintiffs' complaint were warranted.  *Id.* at 1011-13.  With respect to the alleged finder's fee paid to Equity, the court examined its precedent in *Krispin*, which urged looking to "the originating entity (the bank), and not the ongoing assignee . . . in determining whether the NBA applies." *Id.* at 1013 (quoting *Krispin*, 218 F.3d at 924).  GNBT was the acknowledged lender that "funded and made the loans and charged the fees," and accordingly, plaintiffs failed in their attempt to evade the NBA by characterizing certain fees as non-interest "finder's fees" paid to Equity.  *Id.*

The Second Circuit found *Krispin* and *Phipps* distinguishable, but did not repudiate their reasoning.  Far from it.  With respect to *Krispin*, Judge Straub, writing for the *Madden* panel, discerned that "when the national bank's

38

receivables were purchased by May Stores, the national bank *retained ownership* of the accounts," whereas in *Madden*, neither BoA nor FIA "*retained an interest* in [plaintiff's] account." *Madden*, 786 F.3d at 252 (emphasis added). From this distinction, flowed the obvious conclusion that subjecting Midland to state regulations would not "prevent or interfere with the exercise of BoA or FIA's powers." *Id.* at 252-53. The Second Circuit distinguished *Phipps* on similar grounds. "There, the national bank was the entity that *charged* the interest to which the plaintiff objected." *Id.* at 253 (emphasis added). The *Madden* plaintiff, on the other hand, "object[ed] only to the interest charged *after her account was sold* by [the national bank] to the defendants." *Id.* (emphasis added).

The Second Circuit's basis for distinguishing *Madden* from *Krispin* and *Phipps* does not obtain here. Capital One both retained ownership of the underlying credit card accounts, as in *Krispin*, and determined the rate of interest to which Plaintiffs now object, as with *Phipps*. Plaintiffs apparently recognize this, and so, downplay *Madden*'s analysis of *Krispin* as immaterial to the Second Circuit's non-preemption finding. (Opp. 17.) According to Plaintiffs, "the Second Circuit's treatment of *Krispin* in *Madden* makes clear that the supposedly differentiating fact in *Krispin* was of no significance." (*Id.*) Therefore, "even if there had been retained account ownership,

the Second Circuit would not have found 'significant interference' with national bank powers." (*Id.* (citing *Madden*, 786 F.3d at 252-253).)

Plaintiffs misapprehend *Madden*, and consequently arrive at a flawed conclusion. The Second Circuit did observe that May Bank's designation as the "originating entity" had "no significance" to the Eighth Circuit's preemption finding. But this was only because the gravamen of *Krispin*'s preemption holding was the national bank's ongoing relationship with the debt in question, not its nominal designation as debt originator. Judge Straub explained, using a counterfactual, that the Eighth Circuit would have reached a different outcome had May Bank "originated the credits in question," but subsequently "sold them outright to a new, unrelated owner, divesting itself completely of any continuing interest in them, so that its operations would no longer be affected by the application of state law to the new owner's further administration of the credits." *Madden*, 786 F.3d at 252 n.2. The Second Circuit's point was that the originator's status as a national bank was not dispositive. As Judge Straub's counterfactual makes clear, May Bank's nominal status as originator was not the "differentiating fact" of *Krispin*, but rather, the bank's continued role in issuing credits, processing and servicing customer accounts, and setting interest and late

40

fees.  *See Krispin*, 218 F.3d at 924.  All of which applies to

Capital One.  (*See, e.g.*, Prospectus 63.)  At bottom, nothing in

*Madden* supports Plaintiffs' sweeping assertion that the Second

Circuit would have rejected preemption *even if* BoA and FIA

retained ownership of the credit card accounts at issue.  Here,

Capital One retains ownership of the underlying credit accounts,

and reserves the right to change terms, such as interest and

late fees.  It thus maintains a continuous relationship with the

customer accounts that goes beyond its designation as originator

of those accounts.[9]

Courts in this Circuit have also construed *Madden*

narrowly, and certainly not in the manner advanced by

Plaintiffs.  For example, one district judge stated that,

"*Madden* stands for the simple proposition that a non-national

bank entity cannot charge an interest rate exceeding that

permitted by New York law after it has purchased the debt from a

national bank entity, in the absence of additional

considerations."  *Gissendaner v. Credit Corp Sols., Inc.*, 358 F.

Supp. 3d 213, 220 (W.D.N.Y. 2019).  Another case, *Cole v.

Stephen Einstein & Assocs., P.C.*, noted *Madden*'s "refus[al] to

_____

[9]      On a related note, the reasoning behind *Madden*, *Krispin*, and *Phipps*,
belie NCLC and CRL's concern that NBA preemption will pave the way for
predatory lenders to "use" national banks to circumvent local usury laws.
(*See* NCLC/CRL *Amicus* Br. 4.)  A national bank's origination of credit card
loans, in and of itself, is not enough to invoke NBA preemption.  As *Madden*
acknowledged, a national bank must have a continuous relationship with the
underlying debt in order for non-bank entities to raise a preemption defense
against state law usury claims.

41

apply NBA preemption where a non-national bank entity sought to charge an interest rate exceeding that permitted by New York law after it had purchased the debt from a national bank entity." 365 F. Supp. 3d 319, 333 (W.D.N.Y. 2019). The *Cole* court's review of *Madden*, and the distinction drawn with *Phipps*, led it to conclude that "interest charged by a national bank . . . does not become interest charged by a third-party once the balance has been sold off." *Id.* at 334. And in *Petersen*, Judge Vilardo adopted the Judge McCarthy's decision recommending preemption, focusing particularly on the distinction between *Madden* and *Krispin* discussed above. *Petersen*, 2020 WL 5628935, at *6 ("Unlike in *Madden*—where the national banks had entirely 'discharged,' and no longer 'possessed any further interest in,' the loan account—here JPMCB retains a number of rights[;] JPMCB is therefore akin to the national bank in *Krispin*[.]). In short, *Petersen*, *Cole*, and *Gissendaner* recognize that *Madden*'s outcome turned on the fact that BoA and FIA relinquished their interests in the underlying debt. To reiterate, that is not the case with Capital One.

In sum, although Defendants acquired credit card receivables from Capital One in the course of the securitization transactions, Capital One retains ownership and control of the underlying credit card accounts, remains the entity that lends money to Plaintiffs, charges fees and interest to Plaintiffs,

sets Plaintiffs' interest rates, establishes Plaintiffs' credit limits, and receives principal and interest payments from Plaintiffs.  *Madden* is therefore not only distinguishable, it supports this court's conclusion that the NBA preempts Plaintiffs' usury claim.

### III. The Unjust Enrichment Claim is Derivative and Duplicative

Plaintiffs' unjust enrichment claim under common law also fails to state a claim because it is duplicative of Plaintiffs' usury claim, and therefore preempted.  The Amended Complaint alleges that "Defendants have been and continue to be unjustly enriched at the expense of Plaintiffs and the Class as a result of their payment of excessive and improper interest rates."  (¶ 90.)  Plaintiffs' unjust enrichment claim presumes Defendants charged excessive interest, *i.e.* violated New York's usury statute.  As stated above, Defendants' collection of receivables was not subject to New York's usury law, but rather Virginia's.  Virginia does not prescribe interest rate limits, as relevant here.  Accordingly, the court "cannot conceive of any set of facts upon which [Plaintiffs] would fail to establish [their usury claim], but nonetheless succeed in proving unjust enrichment."  *Silva v. Smucker Nat. Foods, Inc.*, No. 14-CV-6154 JG RML, 2015 WL 5360022, at *12 (E.D.N.Y. Sept. 14, 2015); *see also Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 479-80 (S.D.N.Y. 2016) (because the "plaintiffs articulate no theory of

unjust conduct independent of the alleged acts" underlying the plaintiffs' other claims, the unjust enrichment claim is "derivative and duplicative."). Therefore, Plaintiffs' unjust enrichment claim also fails.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. Plaintiffs' Amended Complaint is DISMISSED in its entirety. Plaintiffs fail to state a claim under New York's usury statute, which is preempted by the National Bank Act. The court declines to consider the applicability of the "valid when made" doctrine because the issue is moot. Moreover, Plaintiffs' unjust enrichment claim is dismissed as duplicative of their preempted usury claim. Finally, the court finds that any pleading amendment would be futile, and therefore dismisses the Amended Complaint with prejudice. The Clerk of the Court is respectfully directed to enter judgment and to close the case.

**SO ORDERED.**

Dated: September 28, 2020
      Brooklyn, New York

                                       /s/

                                   **KIYO A. MATSUMOTO**
                                   United States District Judge
                                   Eastern District of New York